## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

B-MEX, LLC, a Colorado Company;
B-MEX II, LLC, a Colorado Company;
PALMAS SOUTH, LLC, a Colorado Company;
OAXACA INVESTMENTS, LLC, a Colorado Company;
SANTA FE MEXICO INVESTMENTS, LLC, a Colorado Company;
GORDON BURR; ERIN BURR; JOHN CONLEY;
DEANA ANTHONE; NEIL AYERVAIS; DOUGLAS BLACK;
HOWARD BURNS; MARK BURR;
CADDIS CAPITAL, LLC, a Colorado Company;
DIAMOND FINANCIAL GROUP, INC., a Colorado Company;
EMI CONSULTING, LLC, a Colorado Company;
FAMILY VACATION SPENDING, LLC, a Colorado Company;
DAVID FIGUEIREDO;
FINANCIAL VISIONS, INC., a Colorado Corporation;
LOU FOHN;
J. JOHNSON CONSULTING, LLC, a Colorado Company;
J. PAUL CONSULTING CORP., a Colorado Corporation;
LAS KDL, LLC, a Colorado Company;
DEBBIE LOMBARDI; SCOTT LOWERY; THOMAS MALLEY;
MATHIS FAMILY PARTNERS, LTD., a Colorado Limited Partnership;
PALMAS HOLDINGS, INC., a Colorado Corporation;
RALPH S. PITTMAN; DANIEL RUDDEN; PEG RUDDEN;
ROBERT E. SAWDON; RANDALL TAYLOR;
TRUDE FUND II, LLC, a Colorado Company;
TRUDE FUND III, LLC, a Colorado Company;
VICTORY FUND, LLC, a Colorado Company; and
JAMES H. WATSON, JR.;

*Plaintiffs*,

v.

JOSÉ BENJAMÍN CHOW DEL CAMPO,
LUC PELCHAT, and
ALFONSO RENDÓN ABUD,

*Defendants*.

---

## COMPLAINT

---

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ....................................................................................................1

II.  PARTIES ................................................................................................................3

III.  JURISDICTION AND VENUE ..............................................................................6

IV.  FACTS ....................................................................................................................7

    A.  2005–2014:  Plaintiffs establish and operate the Casinos profitably through the Juego Companies. ..................................................................7

    B.  April 2014:  The Mexican government corruptly shutters the Casinos. ................10

    C.  May–August 2014:  Defendants present a plan to reopen or sell the Casinos..................................................................................................11

    D.  August 29, 2014:  Defendants take control of the Juego Company boards...........13

    E.  November 7, 2014:  Defendants hold meetings and attempt to steal Plaintiffs' Juego Company shares, thus clouding title to those shares. .................16

    F.  November 2014–August 2015:  Defendants acknowledge Plaintiffs as owners of their shares but refuse to remove the cloud on title to those shares..................................................................................................20

    G.  August 2015–May 2016:  Defendants use the purported illegal transfer of Plaintiffs' shares in the Affected Juego Companies to extort money from Plaintiffs...................................................................................22

    H.  May 2016–Present:  Plaintiffs demand action and give notice of claim, including RICO claims. ................................................................23

    I.  Defendants' fraudulent and extortionate scheme inflicts ongoing injury upon Plaintiffs....................................................................................25

V.  CAUSES OF ACTION .........................................................................................26

    COUNT I  Declaratory Judgment under 28 U.S.C. § 2201 and Colo. Rev. Stat. § 13–51–105  (Against All Defendants) ..................................................26

    COUNT II Violation of 18 U.S.C. § 1962(c) RICO, Pattern of Racketeering Activity (Against All Defendants) .........................................................27

    COUNT III Violation of 18 U.S.C. § 1962(d) RICO, Conspiracy (Against All Defendants) ................................................................................................36

    COUNT IV Violation of Colo. Rev. Stat. §§ 18–17–104(3) COCCA, Racketeering Activity (Against All Defendants)....................................................37

    COUNT V Violation of Colo. Rev. Stat. §§ 18–17–104(4) COCCA, Conspiracy (Against All Defendants) ...................................................................39

    COUNT VI Fraud under Colorado Common Law (Against All Defendants)..................40

COUNT VII Civil Theft under Colo. Rev. Stat. § 4–18–405 (Against All Defendants).............................................................................................42

COUNT VIII Conversion under Colorado Common Law (Against All Defendants).............................................................................................43

COUNT IX Civil Conspiracy (Against All Defendants)....................................44

VI.    JURY DEMAND ..........................................................................................46

VII.   REQUEST FOR RELIEF ............................................................................47

## I.   INTRODUCTION

1.      Plaintiffs collectively own a majority of the controlling Series B shares in five Mexican companies (**Juego Companies**), each of which owns a Mexican casino (collectively, the **Casinos**).  Series B is the only series of shares that carries expansive voting rights to control most resolutions at shareholder meetings, including naming the majority of each Juego Company's board of managers.  After the Mexican Government illegally shut down the Casinos in the Spring of 2014, Plaintiffs sought various avenues to monetize their casino assets in Mexico, including negotiations with Defendants José Benjamín Chow del Campo and Luc Pelchat to sell Plaintiffs' shares in the Juego Companies to a company—Grand Odyssey Casino, S.A. de C.V. (**Grand Odyssey**)—majority-owned and controlled by Chow, who would in turn exchange these shares for shares in a public Canadian company.  The contemplated—but never consummated—transaction would have resulted in the Juego Companies being owned by the public Canadian company, and Plaintiffs would have received shares in the Canadian company as well as a significant cash payment as consideration.

2.      This deal never came to fruition.  During the negotiations for this possible deal, Defendants defrauded Plaintiffs into placing Defendants and their friends on the board of each Juego Company by misrepresenting their need and purpose for being on the boards, as well as making other fraudulent statements and omissions.  Once on the boards of the Juego Companies, Defendants then called and held a shareholder meeting of each Juego Company on November 7, 2014 (**November 2014 Meetings**).  At those meetings, Defendants misrepresented that they had Plaintiffs' authority to transfer Plaintiffs' shares in four of the Juego Companies (**Affected Juego Companies**) to Chow's Grand Odyssey, and then held votes at the meetings in an attempt to transfer Plaintiffs' shares to Grand Odyssey.  This attempted transfer placed a cloud on

Plaintiffs' title, preventing Plaintiffs from taking certain actions on behalf of the Affected Juego Companies, including having insufficient votes to remove Defendants from the boards.

3.      By their own admission, Defendants' attempted transfer of Plaintiffs' shares in the Affected Juego Companies to Grand Odyssey failed, and for months Defendants Chow and Pelchat continued to negotiate to purchase Plaintiffs' shares.  When the potential transaction between Plaintiffs and Defendants Chow and Pelchat reached its final impasse, Defendants refused to correct the actions taken during the November 2014 Meetings and refused to resign from the boards, with Chow and Pelchat instead seeking to extort millions of dollars from Plaintiffs as a condition of undoing their illegal actions and relinquishing their hold over the Juego Companies' boards.

4.      Defendants' fraudulent course of conduct and conspiracy makes them liable to Plaintiffs on causes of action for violation of the federal Racketeering Influenced and Corrupt Organizations Act (**RICO**) and Colorado Organized Crime Control Act (**COCCA**), common law fraud, civil theft, and conversion.

5.      Plaintiffs are in immediate need of a judicial declaration that Plaintiffs—and not Defendants or Grand Odyssey—own all of their shares in the Affected Juego Companies and/or that any transfer that may have been effectuated of Plaintiffs' shares by Defendants was illegal, and requiring Defendants to take all necessary actions to void *ab initio* any illegal transfer. Plaintiffs require this relief because (i) Plaintiffs are unable to sell their shares or sell or protect any of the assets of the Affected Juego Companies while Defendants cloud title to Plaintiffs' shares, and (ii) Plaintiffs are facing off against Mexico in a separate international arbitration, in which Plaintiffs' ownership of the Affected Juego Companies will be at issue.

6.      Plaintiffs therefore seek:

(i) a declaratory judgment that

>    (a) Plaintiffs never transferred their shares in the Affected Juego Companies to Defendants or Defendant Chow's Grand Odyssey; and

>    (b) Defendants did not transfer any of Plaintiffs' shares in the Affected Juego Companies to Defendants or Defendant Chow's Grand Odyssey during the November 2014 Meetings or at any other time, and/or that any transfer that may have been effectuated of Plaintiffs' shares by Defendants was illegal, and requiring Defendants to take all necessary actions to void *ab initio* any illegal transfer;

(ii) a preliminary injunction preventing Defendants from taking any actions on behalf of the Juego Companies unless ordered by this Court to do so;

(iii) a permanent injunction requiring Defendants, within fourteen days of final judgment, to

>    (a) take all actions necessary to void *ab initio* and, if needed, to restore to Plaintiffs unclouded title to their Series B shares in the Affected Juego Companies, including without limitation calling and conducting proper shareholder meetings to declare void *ab initio* and of no effect any actions to transfer Plaintiffs' shares taken at the November 2014 Meetings,

>    (b) deliver the books and all other property and assets of all of the Juego Companies to the Plaintiffs,

>    (c) undo and reverse any unauthorized actions taken by Defendants on behalf of the Juego Companies,

>    (d) immediately thereafter resign from their positions on the board of each Juego Company; and,

(iv) payment of all applicable damages (including treble and punitive damages), prejudgment and post-judgment interest, and attorneys' fees for Defendants' racketeering, fraud, and other illegal actions.

## II.      PARTIES

7.      Plaintiff B-Mex, LLC is a Colorado company with its principal place of business at 2630 W. Belleview Avenue, Suite 220, Littleton, CO 80123.

8.     Plaintiff B-Mex II, LLC is a Colorado company with its principal place of business at 2630 W. Belleview Avenue, Suite 220, Littleton, CO 80123.

9.     Plaintiff Palmas South, LLC is a Colorado company with its principal place of business at 2630 W. Belleview Avenue, Suite 220, Littleton, CO 80123.

10.     Plaintiff Oaxaca Investments, LLC is a Colorado company with its principal place of business at 2630 W. Belleview Avenue, Suite 220, Littleton, CO 80123.

11.     Plaintiff Santa Fe Mexico Investments, LLC is a Colorado company with its principal place of business at 5151 Olive Court, Greenwood Village, CO 80121.

12.     Plaintiff Gordon Burr is an individual residing in Colorado.

13.     Plaintiff Erin Burr is an individual residing in Colorado.

14.     Plaintiff John Conley is an individual residing in Colorado.

15.     Plaintiff Deana Anthone is an individual residing in Colorado.

16.     Plaintiff Neil Ayervais is an individual residing in Colorado.

17.     Plaintiff Douglas Black is an individual residing in Colorado.

18.     Plaintiff Howard Burns is an individual residing in Colorado.

19.     Plaintiff Mark Burr is an individual residing in Colorado.

20.     Plaintiff Caddis Capital, LLC is a Colorado company with its principal place of business at 8321 South Sangre de Cristo Road, Suite 300, Littleton, CO 80127.

21.     Plaintiff Diamond Financial Group, Inc. is a Colorado company with its principal place of business at 1655 East Layton Drive, Englewood, CO 80113.

22.     Plaintiff EMI Consulting, LLC is a Colorado company with its principal place of business at 1777 Larimer Street, #2309, Denver, CO 80202.

23.     Plaintiff Family Vacation Spending, LLC is a Colorado company with its principal place of business at 5460 S. Quebec St., Ste. 105, Greenwood Village, CO 80111.

24.     Plaintiff David Figueiredo is an individual residing in California.

25.     Plaintiff Financial Visions, Inc. is a Colorado corporation with its principal place of business at 5460 S. Quebec St., Ste. 105, Greenwood Village, CO 80111.

26.     Plaintiff Lou Fohn is an individual residing in Colorado.

27.     Plaintiff J. Johnson Consulting, LLC is a Colorado company with its principal place of business at 22877 E. Long Drive, Aurora, CO 80016.

28.     Plaintiff J. Paul Consulting Corp. is a Colorado corporation with its principal place of business at 6222 S. Blackhawk Ct., Centennial, CO 80111.

29.     Plaintiff Las KDL, LLC is a Colorado company with its principal place of business at 15 Lynn Rd., Cherry Hills Village, CO 80113.

30.     Plaintiff Debbie Lombardi is an individual residing in Colorado.

31.     Plaintiff Scott Lowery is an individual residing in Colorado.

32.     Plaintiff Thomas Malley is an individual residing in Colorado.

33.     Plaintiff Mathis Family Partners, Ltd. is a Colorado limited partnership with its principal place of business at 5808 S. Rapp Street, Ste. 205, Littleton, CO 80120.

34.     Plaintiff Palmas Holdings, Inc. is a Colorado corporation with its principal place of business at 902 Brooklawn Dr., Boulder, CO 80303.

35.     Plaintiff Ralph S. Pittman is an individual residing in Colorado.

36.     Plaintiff Daniel Rudden is an individual residing in Colorado.

37.     Plaintiff Peg Rudden is an individual residing in Colorado.

38.     Plaintiff Robert E. Sawdon is an individual residing in Nebraska.

39.    Plaintiff Randall Taylor is an individual residing in Colorado.

40.    Plaintiff Trude Fund II, LLC is a Colorado company with its principal place of business at 8321 South Sangre de Cristo Road, Suite 300, Littleton, CO 80127.

41.    Plaintiff Trude Fund III, LLC is a Colorado company with its principal place of business at 8321 South Sangre de Cristo Road, Suite 300, Littleton, CO 80127.

42.    Plaintiff Victory Fund, LLC is a Colorado company with its principal place of business at 5460 S. Quebec St., Ste. 105, Greenwood Village, CO 80111.

43.    Plaintiff James H. Watson, Jr. is an individual residing in Colorado.

44.    Defendant José Benjamín Chow is a Mexican national and resident of the United States.  He resides at 22 Monet Bend, The Woodlands, TX 77382.

45.    Defendant Luc Pelchat is a Canadian national who, on information and belief, currently resides in Mexico.  His place of business is 570 Granville Street, Suite 300, Vancouver, British Columbia, Canada V6C 3P1.  He can be served with process in Mexico or Canada pursuant to the Hague Convention on the Service Abroad of Judicial and Extra Judicial Documents in Civil and Commercial Matters.

46.    Defendant Alfonso Rendón Abud is a Mexican national residing at Porton de las Flores #36, TD PH1, Lomas Country Club, Huixquilucan, edo Mex, Mexico 52787.  He can be served with process pursuant to the Hague Convention on the Service Abroad of Judicial and Extra Judicial Documents in Civil and Commercial Matters, or pursuant to Inter-American Convention on Letters Rogatory and Additional Protocol.

### III.    JURISDICTION AND VENUE

47.    The Court has subject matter jurisdiction of this matter pursuant to 28 U.S.C. § 1331 (federal question) and 18 U.S.C. § 1964 (RICO).

48.     The court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367.

49.     The Court has personal jurisdiction over Defendants because Defendants purposefully availed themselves of the jurisdiction of the United States and Colorado.  As stated above, every Plaintiff save two resides or is based in Colorado.  In furtherance of their scheme and as part of their conspiracy directed against Plaintiffs, Defendants sent, made, directed, and/or authorized and approved of phone calls, emails, and text messages to one or more Plaintiffs in Colorado, and Defendants Chow and Pelchat also attended meetings with each other and with one or more Plaintiffs in Colorado, Texas, and Wyoming.

50.     Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965(a) and (b), as well as 28 U.S.C. § 1391, because Defendants transact affairs in Colorado; because the ends of justice require that Defendants be brought before this Court in light of Defendants' fraudulent and extortionate activity occurring in and directed to Plaintiffs in Colorado; and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Colorado.

## IV.     FACTS

**A.     2005–2014:  Plaintiffs establish and operate the Casinos profitably through the Juego Companies.**

51.     Gordon Burr is a Colorado businessman.  In 2004, he learned of an investment opportunity to develop and operate casinos in Mexico.  He and fellow Colorado businessman and Plaintiff John Conley investigated the opportunity and found it sound.  Burr then set out to recruit additional investors, while Conley undertook recruitment of a management team.

52.     Erin Burr is Gordon Burr's daughter.  In 2005, the Burrs and Conley formed three Colorado limited liability companies to help capitalize and own the five Casinos.  Gordon Burr

and Conley were elected managers of the Colorado companies, which were Plaintiffs B-Mex, LLC, B-Mex II, LLC, and Palmas South, LLC (collectively, **B-Mex Companies**).

53.     In order to operate and channel the necessary investments into the Casinos, Plaintiffs established five Mexican companies (previously defined as the **Juego Companies**) to establish the Casinos in five Mexican cities as follows:  (i) Juegos de Video y Entretenimiento del Sureste, S. de R.L. de C.V. (Villahermosa); (ii) Juegos de Video y Entretenimiento del Centro, S. de R.L. de C.V. (Puebla); (iii) Juegos de Video y Entretenimiento del D.F., S. de R.L. de C.V. (D.F., or the federal district of Mexico City); (iv) Juegos y Videos de Mexico, S. de R.L. de C.V. (Cuernavaca); and (v) Juegos de Video y Entretenimiento de Mexico, S. de R.L. de C.V. (Naucalpan) (the first four are, collectively, **Affected Juego Companies**).  Defendants did not attempt to steal Juegos de Video y Entretenimiento de Mexico's shares because its ownership structure made theft impractical, so ownership of that entity is not at issue in this case; however, Defendants' actions, including assuming board positions on the board of all five Juego Companies under false pretenses and refusing to resign from each board, have caused and continue to cause damages to all Plaintiffs with respect to all Juego Companies.

54.     Initially, the Burrs and Conley used Plaintiff B-Mex to establish the framework and foundation for their operations and to construct the Naucalpan casino through Juegos de Video y Entretenimiento de Mexico.  Then in 2006, the Burrs and Conley used Plaintiffs B-Mex II, LLC and Palmas South, LLC to capitalize and control the operation of the four Affected Juego Companies and to begin establishing the other four Casinos.  More Coloradans joined the effort, becoming investors and participants in management.

55.     Series B shares of the Juego Companies, unlike Series A shares, carry broad voting rights.  The B-Mex Companies own the majority of Series A and A2 shares in each

Company.  Plaintiffs other than the B-Mex Companies collectively own voting control of each Juego Company by holding a majority of Series B shares.

56.     Through the Juego Companies, between 2005 and 2014, Plaintiffs spent tens of millions of dollars to construct, develop, and operate the Casinos.  As noted, Plaintiffs developed one of the five Casinos under the umbrella of Juegos de Video y Entretenimiento de Mexico. Plaintiffs also were in the process of developing casinos in Cancun and Cabo San Lucas, including the development of new opportunities such as internet gaming, but these latter two casino ventures in Cancun and Cabo are not the subject of Defendants' illegal activities. Through their investments, Plaintiffs supplied funds for, among other things, construction and refurbishment of real property, purchase of gaming machines, and the establishment and carrying out of their ongoing casino operations.  The Casinos quickly became highly profitable businesses.

57.     Plaintiffs at all times operated the Casinos properly under Mexican law.  Plaintiffs first operated the Casinos under resolution UG/211/0295/05, dated March 2005, which authorized Juegos de Entretenimiento y Video de Monterrey, S.A. de C.V. (**JEV Monterrey**) to operate casinos in Mexico without the need of a casino permit, given the types of gaming machines that were operating.  Because Plaintiffs were operating the same or materially similar gaming machines, they entered into a joint venture agreement with JEV Monterrey and operated their Casinos initially under the authorization of the JEV Monterrey resolution.

58.     In April 2008, Plaintiffs entered into an agreement with JEV Monterrey and Entretenimiento de Mexico S.A. de C.V. (**EMex**), pursuant to which the Juego Companies terminated the joint-venture agreement with JEV Monterrey.  To support the Juego Companies' operation of the Casinos, certain Plaintiffs established another Mexican company, Exciting

Games S. de R.L. de C.V. (**Exciting Games**), which would assist the Juego Companies by, among other things, holding licenses to operate the Casinos under permits that the Mexican gaming authority had issued in favor of EMex.  The Mexican gaming authority is within the Secretary of the Interior (*Secretaría de Gobernación* or **SEGOB**), which is an executive department of the Mexican federal government.

59.     In May of 2009, SEGOB recognized Exciting Games as an independent operator under EMex's permit, thus allowing operation of the Casinos independent of any authorization granted by EMex.

60.     By November 2012, SEGOB had issued an independent permit (**November 2012 Casino Permit**) in favor of Exciting Games.

61.     The Casinos continued to be profitable throughout all of this time.  The value of Plaintiffs' Juego Company shares remained highly profitable until 2014.

**B.      April 2014:  The Mexican government corruptly shutters the Casinos.**

62.     In January 2013, the Mexican political party known as the Institutional Revolutionary Party, or "PRI" for its Spanish initials, took over the federal government from its main opposition party, the National Action Party, or "PAN" for its Spanish initials.  The PAN-controlled SEGOB had issued various administrative resolutions authorizing Plaintiffs to operate the Casinos, including granting the November 2012 Casino Permit.  Nonetheless, SEGOB's new PRI-appointed director immediately began making public comments questioning the legality of the authorizations/permits that SEGOB had granted to Plaintiffs (under the prior PAN administration).  The PRI-controlled SEGOB began a campaign against Plaintiffs' operations, attacking the PAN-controlled SEGOB's prior orders as unconstitutional.

63.     Ultimately, following a series of very irregular judicial proceedings, where Plaintiffs' constitutional rights to due process were violated, Mexico, through its judiciary and SEGOB, invalidated all of the authorizations and the November 2012 Casino Permit that allowed Plaintiffs to operate their Casinos legally in Mexico.  In violation of an injunction, SEGOB then enlisted federal police and rushed to close the Casinos on April 24, 2014, with officials brandishing firearms.  It did so even though Plaintiffs' appeals of the judicial decisions affecting its permits were still underway.  SEGOB made customers leave, locked in employees for part of the day, and ultimately placed seals on each entrance.  All of this violated applicable law.

64.     Plaintiffs' valuable electronic gaming equipment and other assets immediately began deteriorating behind closed doors.  Liabilities to landlords, employees, and lenders continued to mount with no revenue to support them.

65.     Plaintiffs began to hear that irrational, political prejudice might not allow the Casinos to reopen unless the Juego Companies' U.S. ownership changed to remove all U.S. owners from the boards of the companies.  Plaintiffs thus began to investigate options on business structures that could allow them to resurrect their Casinos and the Juego Companies.

**C.     May–August 2014:  Defendants present a plan to reopen or sell the Casinos.**

66.     Plaintiffs desired to pursue negotiations that would secure a return on their investment, notwithstanding the conduct of the Mexican government.  Defendant Benjamin Chow and his company Grand Odyssey, with the aid of Defendant Pelchat, emerged as what appeared to be the best option.

67.     Chow already controlled one casino in Mexico.  He claimed to have access to and support of decision-makers within the Mexican government, including Minister Miguel Angel Osorio Chong, a Mexican politician who serves as the Secretary of the Interior (*i.e.*, head of

SEGOB) in the cabinet of President Enrique Peña Nieto of the PRI party. Chow claimed that his relationship with Chong could help re-open the shuttered Casinos under Grand Odyssey's operating license—if the shareholders of the Juego Companies sold their interests to Grand Odyssey, which in turn would sell the interests to a publicly-traded Canadian company. As part of Chow's proposal, Plaintiffs would be issued shares in the Canadian company and would receive a cash payment as consideration for the share sale and/or swap. The Canadian company would be the owner of the Juego Companies and the Casinos, which would re-open under new ownership and continue operating profitably, as before. In that way, Plaintiffs could continue to benefit from the fruits of their labor in establishing the Casinos and making them a profitable business venture in Mexico.

68.     Defendant Luc Pelchat is a Canadian who lives part time in Mexico. He is also Chow's close friend and co-investor. Pelchat and Chow entered into a conspiracy against Plaintiffs at least as early as June 2014.

69.     Since 2013, Grand Odyssey had a revenue-sharing agreement with a Canadian company called 37 Capital Inc. (then called High 5 Ventures Inc.) (**37 Capital**). Pelchat was 37 Capital's attorney-in-fact.

70.     Chow and Pelchat proposed that the shareholders of the Juego Companies sell their shares in return for cash and publicly-traded 37 Capital stock. Chow signed a letter of intent for Grand Odyssey in this regard on July 2, 2014 (**July 2014 LOI**). *See* **Exhibit 1**. The letter was addressed to "B-Mex Group" in Colorado and stated that any disputes among the parties would take place in Colorado under Colorado law.

71.     After Chow and a majority of each Juego Company's board executed the July 2014 LOI, Chow and Pelchat began negotiations in earnest with Plaintiffs. Upon information

and belief, Pelchat and Chow also at this time began to meet with some of the Mexican shareholders in the Juego Companies, and began turning them against Plaintiffs.  Plaintiffs only learned of this much later in time.

72.     Around this time, Defendant Alfonso Rendón, who had initially invested in the Juego Companies, and who at certain times served as Director of Marketing for the Casinos, began a relationship with Chow and agreed to help Chow obtain control of the Juego Companies.

73.     By early August 2014, it appeared that 37 Capital might not be able to handle all of the contemplated transactions.  At a meeting in Denver on August 8, 2014, Chow (for Grand Odyssey) signed a Stock Purchase Agreement with many Plaintiffs effective July 30, 2014 (**July 2014 SPA**).  The July 2014 SPA stated that the parties might need to find a different publicly-traded Canadian entity to take 37 Capital's place.

74.     The July 2014 SPA further stated that the Juego Company shareholders would sell their shares for consideration consisting of $5 million in cash, $25 million in convertible notes in a publicly-traded Canadian company, and millions of shares of stock in that company.  Nothing in the July 2014 SPA or any communications between the parties discussed or suggested that the Juego Company shareholders, including Plaintiffs, would give up their shares without that consideration.

**D.     August 29, 2014:  Defendants take control of the Juego Company boards.**

75.     On August 29, 2014, each Juego Company held a shareholders' meeting (**August 2014 Meetings**).  Plaintiffs acted through proxy letters (in the form of powers of attorney) sent and entrusted to Chow.  Each proxy letter was verified by a notary public in the corresponding Plaintiff's state of residence, and each contained a uniquely-numbered apostille signed by the Secretary of that state in order to authenticate the letter and identify each Plaintiff in foreign

transactions.  Chow obtained the proxies by insisting that the Mexican government would not approve the contemplated transaction unless he took control of the Juego Companies and all U.S. investors were removed from the boards of these companies.  Plaintiffs had no reason to distrust Chow at this stage based upon what the Plaintiffs knew at the time.

76.     Up until the August 2014 Meetings, Plaintiffs Gordon Burr, John Conley, and Dan Rudden had served on the boards of the Juego Companies.

77.     Two important actions occurred at the August 2014 Meetings.  First, Chow and Pelchat removed Plaintiffs' representatives from the board of each Affected Juego Company. Second, they replaced each board with Chow, Pelchat, Rendón, and two others they selected, with Chow as chair of each board.  They also replaced the board of Juegos de Video y Entretenimiento de Mexico with Defendants Chow, Pelchat, Gabriel Velasco, and two others, again with Chow as chair.

78.     This marked a pivotal step in Defendants' implementation of their fraudulent scheme to take total control of the Juego Company boards through misrepresentations, and to prevent their removal from the boards by appropriating Plaintiffs' Series B shares in the Affected Juego Companies.

79.     In obtaining Plaintiffs' proxy letters, Chow and Pelchat represented that without these changes to the boards, including the removal of Plaintiffs' representatives, SEGOB would refuse to approve the contemplated transaction in which Plaintiffs' shares in the Juego Companies would be swapped for cash and shares in a publicly-traded Canadian company by the end of 2014.  Notwithstanding the change in board control, the Mexican Government never allowed the Casinos to re-open.

80.     Plaintiffs' purpose in allowing Chow and Pelchat onto the boards of the Juego Companies was to further the above-described contemplated commercial transaction.  Plaintiffs never agreed—and their proxies never had as their purpose—to simply grant control of the Juego Companies to Chow, Pelchat and their designees in the absence of the contemplated transaction between Plaintiffs on the one hand and Chow/Pelchat and the publicly-traded company on the other.  Yet Defendants have attempted to maintain control of the boards even after it was clear that the underlying transaction would not materialize.  Had Plaintiffs known Defendants' true intentions to take and retain control of the boards of the Juego Companies even after the contemplated transaction fell through, they would never have given the proxies that allowed the Defendants to gain access to and control of the boards of the Juego Companies.

81.     Exercising the proxy letters which he obtained based on his false representations, Chow not only changed the board members during the August 2014 Meetings, but also stated, falsely, that he already had the unconditional approval of the Plaintiffs to transfer their shares in the Affected Juego Companies to Grand Odyssey.  This is recorded within the minutes of the August Meetings and was not true, as Plaintiffs had not granted any such unconditional approval.  *See* **Exhibit 2** at 10-11.  Plaintiffs' approval for any share transfer in the Affected Juego Companies still was subject, *inter alia*, to (i) the successful further negotiation of the contemplated transaction between Plaintiffs and certain of the Defendants plus other involved parties; (ii) the payment of the consideration for the deal; and, (iii) Defendants securing approval from SEGOB to reopen the Casinos.  None of these things ever occurred.

82.     Plaintiffs continued to negotiate with Chow and Pelchat in hopes of signing a definitive agreement to bring the contemplated transactions to fruition.  Chow visited Plaintiffs in Colorado on October 7, 14–16, and 21–22, 2014, to continue the discussions.  Pelchat also

visited Plaintiffs in Colorado on October 22, 2014 to discuss the ongoing contemplated transaction.

83.     At these meetings in Colorado, Chow gave a presentation on his supposed progress toward reopening the Casinos.  In the presentation, Chow asserted that according to the Mexican Government, only "one more hurdle" existed, after which the Casinos would reopen as planned in December 2014.  On information and belief, these statements were false, and Chow had no assurance from SEGOB or others within the Mexican Government that SEGOB would ever grant its approval to reopen the Casinos.

**E.     November 7, 2014:  Defendants hold meetings and attempt to steal Plaintiffs' Juego Company shares, thus clouding title to those shares.**

84.     On October 28, 2014, Defendants, on behalf of each Juego Company, sent a notice to the shareholders for shareholder meetings to be held November 7 (**November 2014 Meetings**).  An item on the proposed agenda called for "discussion and, if applicable, approval of the transfer of shares issued by the Association."  This agenda item, identical to an agenda item for the August 2014 Meetings, referred to the approval of a handful of share transfers that had occurred among U.S. shareholders due to sales in bankruptcy, shareholder deaths, and the like.  The Burrs and others had been asking Chow to allow the shareholders to approve those transfers since the August 2014 Meetings, but he ignored these requests.  Instead, although the agenda item had nothing to do with a supposed transfer to Grand Odyssey, Defendants used the item as cover to steal Plaintiffs' shares.

85.     Importantly, however, no final and binding SPA had been signed by the time of the November 2014 Meetings, and Defendants had not paid any consideration to Plaintiffs for the transfer of their shares.  As such, Plaintiffs never gave authorization for their shares to be transferred to Grand Odyssey or anyone else at the November 2014 Meetings.

86.     Plaintiffs were to be represented by proxy at the November 2014 Meetings by Plaintiffs' lead Mexican counsel, Julio Gutierrez Morales.   Plaintiffs now no longer trusted Chow's intentions and were aware of the importance that no unauthorized actions be taken on their behalf at the shareholders' meetings.   Therefore, even though Chow asked for the proxy letters and was in Denver to continue negotiations on November 4–5, 2014, Plaintiffs sent them to their counsel in Mexico to ensure that proxies would not be used improperly.   Plaintiffs further instructed that their proxy letters would not be delivered for use at the November 2014 Meetings until Plaintiffs' counsel reviewed the final minutes of the shareholder meetings, thereby preventing unauthorized approvals of unauthorized corporate actions.

87.     The proxies contemplated that certain share transfers could be recognized at the November 2014 Meetings to clear chain of ownership for certain shareholders who had deaths in the family and other events requiring minor share transfers.   The proxies *did not* authorize any share transfers to Grand Odyssey.   The reason was simple.   The parties had not yet finalized any negotiations to transfer the Plaintiffs' shares to Grand Odyssey and ultimately to a publicly-traded Canadian company, and no consideration had yet been paid for the share transfers to occur.

88.     During the November 2014 Meetings and before counsel for the Plaintiffs arrived, upon information and belief, Chow and Pelchat represented to those in attendance that Plaintiffs already had granted their authorizations to have their shares in the Affected Juego Companies transferred to Grand Odyssey.   Chow and Pelchat also represented to those in attendance that the deal to transfer the existing shares in the Juego Companies, including those owned by both U.S. and Mexican shareholders, was finalized and approved by all parties.   Chow further represented that very soon the Casinos would reopen, and that the existing shareholders in the Juego

Companies would receive in the near future their swapped shares in the publicly-traded Canadian company, which would be the new owner of the Juego Companies and the Casinos.  All of these representations were false and intended to induce those in attendance, mostly Mexican shareholders in the Juego Companies, to authorize the transfer of the Plaintiffs' shares in the Affected Juego Companies to Grand Odyssey.

89.     After the business of the November 2014 Meetings concluded, the meetings' secretary immediately presented pre-drafted final minutes for signature by Chow as president of each board and by each shareholder in attendance.  The final minutes for each Affected Juego Company stated that the shareholders "unanimously" approved transfer of Plaintiffs' Series B shares to Grand Odyssey, acceptance of Grand Odyssey as a new shareholder in the Affected Juego Companies, and issuance of Plaintiffs' shares to Grand Odyssey.

90.     These minutes were false and fraudulent.  To the contrary, Plaintiffs at all times constituted the majority of Class B shares in the Affected Juego Companies, and they undertook no such actions during, prior to, or after the November 2014 Meetings.  As Defendants knew well, no definitive SPA had been executed, the contemplated transaction was still being negotiated between the parties, and no consideration had been paid to authorize or justify the transfer of Plaintiffs' shares.

91.     A representative from Plaintiffs' counsel's firm ultimately arrived at the November 2014 Meetings and discovered that the minutes of the meeting purported to authorize the transfer of Plaintiffs' shares to Grand Odyssey, even though no such authorization had been given by Plaintiffs and no quorum existed without Plaintiffs.  He objected to the accuracy and validity of the minutes.  Defendants Chow and Pelchat tried to force counsel to sign the minutes. He refused to sign, delivered no proxy letters to Defendants or the meeting secretary, informed

Defendants that the minutes were contrary to Plaintiffs' will, and left the meeting without authorizing Chow or anyone else at the meeting to take any actions on behalf of Plaintiffs.

92.     The bylaws of each of the Affected Juego Companies, which are substantially identical in this regard,[1] contain no mechanism by which a shareholders meeting, or minutes of such meeting, can, standing alone, effectuate a transfer of a shareholder's shares to a third party. To the contrary, Article II, Section 13 of each set of bylaws merely allows a meeting to *approve* a voluntary transfer that occurs between the transferor and transferee:

> Shareholders can transfer, cede, sell, encumber, or dispose their shares in any other way according to the requirements of this section and only with prior authorization of a majority of the members of the Board of Managers.  Similarly, the Company can admit new partners with prior authorization of a majority of the Board of Managers, and by consent made in a Shareholders' Meeting by a majority of votes of partners holding Series B shares.  Any acquisition of shares of the Company by third parties in contravention to the requirements contained in the present Article will not be recognized by the Company.

Section 14 continues:

> Acceptance of new partners will occur after acceptance as qualified partners by the Board of Managers and resolution by Shareholders' Meeting made by majority vote of the shareholders holding all Series of shares.

93.     These high hurdles prevent third parties from becoming new shareholders in the Juego Companies unless various formalities occur.  Importantly, these requirements were not met during the November 2014 Meetings.

94.     Under the Juego Company bylaws and the text of the minutes, no colorable argument exists that Plaintiffs transferred their shares in the November 2014 Meetings for at least the following reasons:

>    a.  Plaintiffs and Grand Odyssey never executed an agreement that transferred shares or exchanged contemplated consideration to effectuate such a transfer;

---

[1]   The only exception is that Section 13 of the bylaws of Juegos de Videos y Entretenimiento del Sureste requires Series B holders to approve not only admission of new partners but also the transfer of shares.

b. No resolution at the November 2014 Meetings or in the minutes purported to transfer any shares, but instead merely purported to approve a transfer to Grand Odyssey that never occurred;

c. Without Plaintiffs, no quorum existed at the November 2014 Meetings;

d. Plaintiffs, by proxy or otherwise, never voted to transfer their Series B shares;

e. Plaintiffs, by proxy or otherwise, never voted to approve Grand Odyssey as a shareholder;

f. Plaintiffs' proxies were never delivered to the meeting president or secretary of the November 2014 Meetings;

g. Plaintiffs' representative informed Defendants at the November 2014 Meetings that no transfer of shares had taken place; and

h. Plaintiffs' representative refused to sign the minutes of the November 2014 Meetings.

**F.   November 2014–August 2015:  Defendants acknowledge Plaintiffs as owners of their shares but refuse to remove the cloud on title to those shares.**

95.     Importantly, following the November 2014 Meetings, and until August 2015, Defendants acknowledged in person and in writing that no transfer occurred and that Grand Odyssey owned no shares.  As well, Chow and Pelchat purported to continue negotiations toward a definitive SPA that could result in a transfer of Plaintiffs' shares.  Nonetheless, Defendants refused to resign from the boards of the Juego Companies, and refused to call new shareholder meetings to reaffirm that Plaintiffs' shares were not transferred to Grand Odyssey at the November 2014 Meetings.

96.     In addition to multiple phone calls, emails, and visits during this period from and by Defendants Chow and Pelchat to Plaintiffs Gordon Burr and John Conley in Colorado and/or to their counsel in Mexico and in the United States, Chow visited Denver on April 23, 2015 to

negotiate with the B-Mex Company managers, including Plaintiffs Gordon Burr, John Conley, and Dan Rudden.

97.     After Pelchat and Chow attempted unsuccessfully to substitute in a different Canadian company to take the place of 37 Capital, Chow and Grand Odyssey began to negotiate a purchase of the Juego Companies' assets directly through an asset purchase agreement (**APA**) rather than seeking to acquire Plaintiffs' shares in the companies.  In a "Binding Letter of Intent" dated June 30, 2015 (**June 2015 LOI**), Chow (for Grand Odyssey) and the B-Mex Companies agreed in relevant part, under the heading "Ownership of Casino Companies," that the true owners of the shares in all of the Juego Companies were Plaintiffs, not Grand Odyssey:

> [The Juego Companies] each owns a casino facility and casino assets in Mexico. The principal Shareholders of the Owners are three Colorado limited liability companies, B-Mex, LLC, B-Mex II, LLC, and Palmas South, LLC and certain other American citizens, including without limitation Gordon Burr, Daniel Rudden and John Conley and the entities for which they have voting control or authority to vote and Mexican nationals.

Chow signed the June 2015 LOI.  This is the last agreement that Chow signed with any Plaintiff, and it is governed by Colorado law.

98.     During the APA negotiations, which opened with the June 2015 LOI, Chow expressly represented that he had connections in SEGOB; that he, through Grand Odyssey, could reopen the Casinos under a royalty-free license with a permit holder; and that he would acquire financing to purchase the Juego Companies' assets.  All of these representations were false. Chow admitted as much on August 3, 2015, while meeting in Denver with Plaintiffs John Conley, Dan Rudden, and Neil Ayervais.

99.     Furthermore, throughout the sustained course of the extended negotiations, Chow continued to agree that he would call shareholder meetings to reaffirm that Plaintiffs' shares had not been transferred at the November 2014 Meetings, and that Defendants would cede control of

the board of each Juego Company. While in Denver on August 3, 2015, Chow promised to send shareholder notices calling those shareholder meetings within a week. This was another misrepresentation. Chow never called for these shareholder meetings to take place and never intended to do so.

**G.     August 2015–May 2016:  Defendants use the purported illegal transfer of Plaintiffs' shares in the Affected Juego Companies to extort money from Plaintiffs.**

100.    Eventually, Plaintiffs grew increasingly more skeptical of Chow's promises of action and Defendants' overall inaction. Therefore, after the June 2015 LOI expired, Plaintiffs started negotiating a sale of the assets of the Juego Companies with Mexican conglomerate Televisa.

101.    To Plaintiffs' shock, Chow took action revealing that Defendants had been conducting an elaborate fraud. On information and belief, Chow intervened in the planned sale to Televisa, indicating to Televisa, and introducing doubt, that Chow, his friends on the Juego Company boards, and Grand Odyssey would not approve the sale and that Televisa could not receive clear title to the assets of the Casinos without years of litigation.

102.    Further, on August 27, 2015, two of the investors and board members in the B-Mex Companies sent Chow and Pelchat a letter (dated August 26, 2015) confirming that no sale of shares had ever occurred; terminating all agreements with Chow and Pelchat; and demanding that Chow and Pelchat take no action for the Juego Companies and renounce their managerial positions at the Juego Companies.

103.    In response to the August 27, 2015 letter, Chow responded by email to Plaintiffs in Colorado:  "Let's meet next Thursday in order to review the expenses and the process to change the shares and management. I suggest to do this in Mexico." *See* **Exhibit 3**. With this, Defendants shifted their fraudulent plan to one of extortion.

104. From that day to the present, by their actions in meetings in Colorado and Texas, and in telephone calls with Plaintiffs Gordon Burr, John Conley, Dan Rudden, and Neil Ayervais, Defendants Chow and Pelchat have (i) insisted that a share transfer did occur at the November 2014 Meetings, and/or that they would not undo the actions of those meetings unless and until they received compensation; (ii) stymied management of the Juego Companies by refusing to resign their positions on each board; and (iii) demanded millions of dollars from Plaintiffs before Defendants will call for and participate in shareholder meetings to resolve that no transfer occurred and to remove Defendants as managers of each board.

105. Defendants have no legitimate legal basis by which to argue that they can cloud ownership of Plaintiffs' shares or refuse to resign from the boards of the Juego Companies until Plaintiffs pay millions of dollars. Nonetheless, Defendants have pressed extortionate demands for such payments, knowing the financial pressure that continues to mount on Plaintiffs' investment in the Casinos and the Juego Companies.

**H. May 2016–Present: Plaintiffs demand action and give notice of claim, including RICO claims.**

106. Plaintiffs unsuccessfully attempted for months to amicably resolve their disputes with Defendants, and to avoid litigation with respect to Defendants' fraudulent and extortionate conduct. Upon realizing that Defendants would not voluntarily undo their illegal actions, on May 13, 2016, Plaintiffs sent a notice of claims to Defendants, demanding that Defendants take all necessary actions to restore complete and undisputed control of the Casinos and Juego Companies to Plaintiffs.

107. Defendant Rendón responded in a conciliatory but incomplete manner, admitting that Chow, at least, committed wrongdoing. The body of his email follows:

> Dear David,
>
> Along with Gabriel we were able to meet with Mr. Gordon Burr in Houston last week.
> I was introduced by Mr. Burr to  Mr.Benjamin -Chow 2 years ago with the intention of selling the companies to Mr
> Benjamin Chow and Mr Luc Pelshat. Gordon rightfully asked me at the time to cooperate in the trasaction.
> Being an investor for juegos de video y entretenimiento de Mexico And having invited other Mexican Investors including
> family members to invest in other Mexican companies regarding the casinos, I at the time cooperated with Mr Burr and
> Mr Chow to try to fullfil the deal in the investors best interests.
> I do not have a friendly relationship with Mr Chow today, since he not only deceived us with the purchase, but also
> affected and mislead me in other matters.
> Therefore after the meeting with Mr Burr, it was understood by all parties that both Gabriel Velasco and myself are
> willing to cooperate regarding matters that can fast forward the anulment of Mr Chow and his group concerning the
> wrongfull purchases as long as both of us are excluded from any legal matters since we do not support him today.
> Mr Chow claimed he had full authorization by all parties involved including U.S companies to go ahead and there were
> representatives from those U.S investors at the time documents got signed by everybody

*See* **Exhibit 4**.

108.    Gabriel Velasco, who was a potential defendant at the time, also responded in a conciliatory manner, pointing out that, at the very least, Chow engaged in wrongdoing.  The body of his email follows:

> Hi David, we had a meting with Gordon Bur last week in Houston, we have agreed to cooparete and help you and the
> investors in anything you guys need, as you know we did not have anything to do with those asambles, Gordon Burr is aware
> of this, we can help with anything you need from the mexican investors and into this claim to Benjamin and his assosiates,
> Please let us know what we need to due or what is the next step.
> I had a phone conversation with Gordon last Friday  and he know we are pushing on the investors behalf and we are
> recomending Benjamin to give back what he took, I like to clarify that I was not aware of these asamble until Julio Gutierrez
> pointed out and they put me as a board member with out my authorization, Benjamin Told Gordon that I did not sing that
> asamble, and he told me, that I am only a board  member on Naucalpan and that in Naucalpan they did not make any transfer
> of stock what so ever.
> Please let us know what we need to due.

*See* **Exhibit 5**.

109.    In contrast, Chow and Pelchat continued their extortionate scheme.  They responded to the notice of claims through counsel and falsely maintained that the Juego Companies "are formed by Mexican shareholders."  *See* **Exhibit 6**.  Chow and Pelchat know these statements to be untrue because the Juego Companies were formed under the initiative, instruction, and direction of certain of the Plaintiffs, who are U.S. citizens, and who became

shareholders immediately following the initial capitalization of the companies. Refusing to simply remove the cloud over Plaintiffs' shares, Chow and Pelchat stated a desire to "tell you of some claims of our own." They have made it clear that they will only remove the cloud on Plaintiffs' title if Plaintiffs pay compensation for Defendants' attempted theft.

**I.      Defendants' fraudulent and extortionate scheme inflicts ongoing injury upon Plaintiffs.**

110.    Defendants' conduct not only clouds ownership of Plaintiffs' shares, it also complicates determination whether Plaintiffs—as rightful owners of majority control of the Juego Companies—have the right to take certain actions on behalf of the Juego Companies or are instead left to the whims of Defendants.

111.    Without extensive discovery, it is impossible to know all that Defendants have done in the name of the Juego Companies to cause additional harm to Plaintiffs. Defendants' status as Juego Company managers adds important context to the attempted theft and ongoing extortion of Plaintiffs.

112.    Because of Defendants' actions, Plaintiffs have been unable to sell the assets of the Casinos or to take other actions that they want to take and that require board approval. Likewise, due in part to Defendants' actions, the Casinos and their assets continue to stagnate and to deteriorate. As evidenced in part by Plaintiffs' failed negotiations with Televisa, Defendants exploit their ability to hold the Juego Companies hostage with a cloud obscuring ownership and management.

## V.     CAUSES OF ACTION

### COUNT I
### Declaratory Judgment under 28 U.S.C. § 2201 and Colo. Rev. Stat. § 13–51–105
### (Against All Defendants)

113.     Plaintiffs reallege and incorporate by reference all of the preceding paragraphs from paragraphs 51 through 112 as if set forth herein.

114.     An actual controversy exists between Plaintiffs and Defendants whether Plaintiffs' Series B shares in the Affected Juego Companies were transferred to Grand Odyssey or to Defendants at the November 2014 Meetings.

115.     By way of example and not limitation, no transfer of Plaintiffs' shares to Grand Odyssey occurred at the November 2014 Meetings because:

   a. Plaintiffs and Grand Odyssey never executed an agreement that transferred shares or exchanged contemplated consideration to effectuate such a transfer;

   b. No resolution at the November 2014 Meetings or in the minutes purported to transfer any shares, but instead merely purported to approve a transfer to Grand Odyssey that never occurred;

   c. Without Plaintiffs, no quorum existed at the November 2014 Meetings;

   d. Plaintiffs, by proxy or otherwise, never voted to transfer their Series B shares;

   e. Plaintiffs, by proxy or otherwise, never voted to approve Grand Odyssey as a shareholder;

   f. Plaintiffs' proxies were never delivered to the meeting president or secretary of the November 2014 Meetings;

   g. Plaintiffs' representative informed Defendants at the November 2014 Meetings that no transfer of shares had taken place; and

   h. Plaintiffs' representative refused to sign the minutes of the November 2014 Meetings.

116.     Because of Defendants' actions, Plaintiffs face great uncertainty with respect to their legal obligations and rights associated with a potential future course of conduct.   A

declaration that Plaintiffs' shares were not transferred is necessary for Plaintiffs to protect their rights in their dispute with Mexico, as well as to transact any sale of their shares or sale of Casino assets, which have languished for more than two years.

117.    Plaintiffs therefore request a declaration that their Affected Juego Company shares were not transferred to Grand Odyssey or any other entity or person at the November 2014 Meetings, and all such other and further relief to which Plaintiffs are entitled.

118.    Pursuant to Federal Rule of Civil Procedure 57, Plaintiffs request a speedy hearing and resolution of this count.  To the extent discovery is found to be necessary, Plaintiffs further request a short discovery and trial schedule to be set by the Court.

**COUNT II**
**Violation of 18 U.S.C. § 1962(c)**
**RICO, Pattern of Racketeering Activity**
**(Against All Defendants)**

119.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs from paragraphs 51 through 112 as if set forth herein.

120.    **Culpable Persons**.  As set forth in detail above, Defendants are each a "person" within the meaning of  18 U.S.C. § 1961(3), who formed an enterprise as defined in 18 U.S.C. § 1961(4), whereby they engaged in a pattern of racketeering activity for the common illegal purpose of assuming control of the board of each of the Juego Companies, attempting the illegal transfer of Plaintiffs' shares of each of the Affected Juego Companies, and purporting to extort millions of dollars to undo the clouded title created by their illegal actions, in violation of 18 U.S.C. § 1962(c).

121.    **Enterprise**.  The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of Defendants, Grand Odyssey, and employees and agents of each.

122.    Defendants used their position as managers of the board of each Juego Company to undertake the fraudulent and extortionate scheme alleged herein.  Defendants could not successfully conduct their scheme without the association that formed this enterprise.

123.    Defendants and their agents, employees, and co-conspirators engaged in the pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the enterprise, which is separate and distinct.

124.    **Pattern of Racketeering Activity and Predicate Acts**.  Defendants, Grand Odyssey, and their agents, employees, and co-conspirators, each being associated with the enterprise, did unlawfully, knowingly, and intentionally conduct and participate, directly and indirectly, in the conduct, management, and operation of the affairs of the enterprise through wrongful and unlawful predicate acts to accomplish both legitimate and illegitimate business goals including, but not limited to, the following:

    a.   Planning and executing the means by which to attempt to strip Plaintiffs of certain of their rights and interests in the Juego Companies;

    b.   Organizing efforts by which to have themselves placed on the boards and in *de facto* control of the Juego Companies;

    c.   Undertaking negotiations to give the appearance of efforts to effect a legitimate and consensual transfer of shares and voting control of the Affected Juego Companies;

    d.   Organizing meetings to conduct business of the Juego Companies, including agenda items respecting transfer of shares and voting control;

    e.   Recording fraudulent and illegitimate minutes of such meetings purporting to ratify transfer of shares and voting control in the Affected Juego Companies that never happened; and

    f.   Engaging in elaborate negotiations and an extortionate scheme by which to obtain monies to which Defendants are not entitled under the threat of inflicting and increasing damages to the Affected Juego Companies by not undoing their illegal actions.

125.    In pursuit of the foregoing goals, the enterprise engaged in, and the activities of the enterprise affected, interstate and foreign commerce through a pattern of racketeering activity consisting of numerous indictable predicate acts, including the following, in violation of 18 U.S.C. § 1962(c), 18 U.S.C. § 1961(1)(A), and 18 U.S.C. § 1961(1)(B):

a.    **Violation of 18 U.S.C. § 1951:    Extortion, and Conspiracy Therewith**. Defendants and their agents, employees, and co-conspirators knowingly and willfully committed multiple predicate acts of extortion.    Each wrongfully used threatened force and fear, as described herein, to attempt or conspire to take or obtain Plaintiffs' shares in the Affected Juego Companies, and to induce Plaintiffs to pay millions of dollars to Defendants to clear title on their shares in the Affected Juego Companies.    These acts of extortion are in violation of 18 U.S.C. § 1951 and constitute "racketeering activity" as defined in 18 U.S.C. § 1961(1)(B).

b.    **Violation of 18 U.S.C. § 1343:    Wire Fraud.**    Defendants and their agents, employees, and co-conspirators knowingly and willfully committed multiple predicate acts of wire fraud.    Each devised, intended to devise, and pursued their fraudulent and extortionate scheme to defraud or to obtain money and property by means of false or fraudulent pretenses, representations, or promises, and transmitted or caused to be transmitted by means of wire communication in interstate and foreign commerce writings and communications for the purpose of executing or attempting to execute such scheme or artifice.    Specific items of wired communication (by electronic mail, phone calls, and text messages) are described in **Exhibit 7**. Discovery will identify numerous other acts of wire fraud in furtherance of Defendants' fraudulent and extortionate scheme, in particular including electronic mail, phone calls, and text messages between Defendants and their agents, employees, and co-conspirators.    These acts of

wire fraud are in violation of 18 U.S.C. § 1343 and constitute "racketeering activity" as defined in 18 U.S.C. § 1961(1)(B).

        c.      **Violation of 18 U.S.C. § 1341: Mail Fraud.** Defendants and their agents, employees, and co-conspirators, on information and belief, knowingly and willfully committed multiple predicate acts of mail fraud. Each devised, intended to devise, and pursued their fraudulent and extortionate scheme to defraud or obtain money and property by means of false or fraudulent pretenses, representations, or promises, and for the purpose of executing or attempting to execute such scheme, placed in a post office or authorized depository mail or documents to be sent or delivered by the Postal Service; and/or deposited or caused to be deposited documents to be sent or delivered by private or commercial interstate carrier; and/or took or received therefrom mail or documents; and/or knowingly caused to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, such mail or documents. Plaintiffs anticipate that discovery will identify numerous acts of mail fraud in furtherance of Defendants' fraudulent and extortionate scheme, in particular including mail to and from Defendant Chow to his residence in The Woodlands, Texas, or related business address. These acts of mail fraud are in violation of 18 U.S.C. § 1341 and constitute "racketeering activity" as defined in 18 U.S.C. § 1961(1)(B).

        d.      **Violation of 18 U.S.C. § 1028(a)(3): Identification, Authentication, and Information Fraud.** Defendants and their agents, employees, and co-conspirators knowingly committed multiple predicate acts of identification, authentication, and information fraud. Each knowingly and fraudulently obtained, and possessed with intent to use unlawfully, five or more identification documents—specifically, Plaintiffs' August 2014 Meeting proxy letters with apostilles from the state of each Plaintiff's residence, each of which was a document made or

issued by or under the authority of the state and is of a type intended or commonly accepted for the purpose of identification of individuals.  Likewise, Defendants and their agents, employees, and co-conspirators knowingly and fraudulently obtained, and possessed with intent to use unlawfully, five or more authentication features—specifically, each apostille identification number, in addition to the signature and seal of a state notary public and Secretary of State, each of which is a means of determining if a document is counterfeit, altered, or otherwise falsified.  Defendants obtained the proxy letters and apostilles in a fraudulent and unlawful manner, and had no authority to use those documents in furtherance of their fraudulent and extortionate scheme.  Defendants intended unlawfully to exploit the identification documents and authentication features to access Plaintiffs' votes at the August 2014 Meetings in order to take control of each Juego Company board by removing Plaintiffs' representatives and replacing them with Defendants and their friends, with the additional intent of arranging shareholder meetings in the near future at which Defendants, controlling each board, would steal or attempt to steal Plaintiffs' Series B shares in the Affected Juego Companies.  These acts of identification, authentication, and information fraud are in violation of 18 U.S.C. § 1028(a)(3) and constitute "racketeering activity" as defined in 18 U.S.C. § 1961(1)(B).

e.      **Violation of 18 U.S.C. § 1028(a)(7):  Identification, Authentication, and Information Fraud.**  Defendants and their agents, employees, and co-conspirators knowingly committed multiple other predicate acts of identification, authentication, and information fraud.  Each knowingly possessed and used by fraud and without lawful authority a means of identification of Plaintiffs—specifically, Plaintiffs' names and signatures as found on Plaintiffs' apostilled August 2014 Meeting proxy letters.   By use of these letters, Defendants intended unlawfully to commit, or to aid or abet or in connection with the commission of, theft or

attempted theft of Plaintiffs' Series B shares in the Affected Juego Companies, which theft or attempted theft constitutes a felony under Colorado law, Colo. Rev. Stat. 18–4–401.  These acts of identification, authentication, and information fraud are in violation of 18 U.S.C. § 1028(a)(7) and constitute "racketeering activity" as defined in 18 U.S.C. § 1961(1)(B).

f.    **Violation of Colo. Rev. Stat. 18–3–207:  Criminal Extortion.**  Defendants and their agents, employees, and co-conspirators knowingly and willfully committed multiple predicate acts contrary to Colorado's criminal prohibition against extortion.  Each pursued their fraudulent and extortionate scheme to obtain money and property by, and without legal authority and with the intent to induce Plaintiffs against their will to pay substantial sums of money, making a substantial threat to cause economic hardship to, or damage the property of, the Plaintiffs; and by threatening to cause the foregoing result by performing or causing an unlawful act to be performed, including attempted theft and extortion, mail fraud, wire fraud, and identity theft as described above.  Defendants' threats were substantial because they were reasonably likely to induce a belief in Plaintiffs that Defendants would carry out the threats, which threatened significant injury or damage.  These acts are in violation of Colo. Rev. Stat. 18–3–207 and constitute "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

g.    **Violation of Colo. Rev. Stat. 18–4–401:  Criminal Theft.**  Defendants and their agents, employees, and co-conspirators knowingly and willfully committed multiple predicate acts contrary to Colorado's criminal prohibition against theft.  Each pursued their fraudulent and extortionate scheme to obtain money and property by knowingly seeking to obtain, retain, or exercise control over Plaintiffs' shares in the Affected Juego Companies worth more than $20,000 without authorization, and/or by threat or deception; and each intended to deprive Plaintiffs permanently of the use or benefit of their shares in the Affected Juego Companies, or

demanded payment of monies to which Defendants are not legally entitled as a condition of restoring the shares in the Affected Juego Companies to Plaintiffs. These acts are in violation of Colo. Rev. Stat. 18–4–401 and constitute "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

126. **Relationship Between, and Continuity of, Predicate Acts.** The predicate acts of criminal racketeering activity described above amounted to a common, ongoing course of conduct intended to cause and in fact furthering the common illegal purpose of assuming control of the board of each of the Juego Companies, attempting the illegal transfer of Plaintiffs' shares of each of the Affected Juego Companies, and purporting to extort millions of dollars to undo the clouded title created by Defendants' illegal actions. Each such racketeering activity was related, having (1) common participants, (2) the same victims, including Plaintiffs, and (3) the same purpose and result of benefiting Defendants and/or their employees, agents, or co-conspirators at the expense of Plaintiffs. The predicate acts constituting a pattern of racketeering activity also were interrelated in that, without each of the foregoing acts, Defendants could not have assumed control of the board of each of the Juego Companies, thereby putting themselves in a position of control and influence to attempt to illegally transfer Plaintiffs' shares of each of the Affected Juego Companies, and thereafter to purport to extort millions of dollars to undo the clouded title created by their illegal actions.

127. Such acts of racketeering activity have been continuous and related, having been part of Defendants and their agents, employees, and co-conspirators regular way of doing business through the enterprise. Moreover, a specific threat of repetition exists, in that Defendants continue to press extortionate demands for millions of dollars to undo the clouded title created by their illegal actions, while at the same time asserting that Plaintiffs do not own

their Series B shares in the Affected Juego Companies and do not control the board of each Juego Company.  They also have refused to resign from the boards of the Juego Companies, thereby continuing to prevent Plaintiffs from exercising their legitimate board control of the Juego Companies.

128.    The enterprise should be treated as an open-ended criminal enterprise, with ongoing criminal activity threatened and likely to continue into the future, as described above. To the extent the enterprise is considered as a close-ended criminal enterprise, the criminal activity began at least as early as August 2014 and continued until at least May 2016, with predicate acts occurring throughout this time period and to the present day.  At minimum, a close-ended RICO enterprise unfolded through a series of related predicate acts extending over at least a 22-month period, and includes a threat of similar future conduct.

129.    **Interstate and Foreign Commerce**.  In the conduct of its pattern of racketeering activity as set forth above, the enterprise regularly involved moving communications and people across state and foreign borders, and therefore was engaged in and affected interstate and foreign commerce.  In the course of in-person negotiations in Colorado in furtherance of the fraudulent and extortionate scheme, members of the enterprise regularly scheduled travel to and from Colorado and may have made other payments, and in doing so, passed money through the United States banking system.  Additionally, demands made by members of the enterprise necessarily intended that, as both purpose and effect, funds would be transferred from Colorado across state and foreign borders as part of their extortionate scheme.

130.    **Injury**.  Each Plaintiff became an owner of shares in the Affected Juego Companies in or before calendar year 2012, and remained an uncontested owner of such shares until the November 2014 Meetings.  As a direct and proximate result of Defendants' and their

agents', employees', and co-conspirators' conduct and participation in the conduct of the affairs of the enterprise through the alleged racketeering activity and conspiracy, including its predicate acts, all Plaintiffs have been injured in their business and property.

131.    All Plaintiffs have been injured in their business and property by reason of Defendants' violation of 18 U.S.C. § 1962(c), because such violation has caused injuries to each Plaintiff, including, but not limited to, (i) loss of board control over the Juego Companies; (ii) inability to sell the Juego Companies or dispose of the assets of the Casinos without Defendants' authorization, which they will not grant unless and until Plaintiffs capitulate to their extortionate demands; (iii) a cloud over the ownership of the Plaintiffs' shares in the Affected Juego Companies; and (iv) other injuries and damages to be proven at trial.   Further, Defendants' racketeering activity continues, as do Plaintiffs' injuries.

132.    Plaintiffs' injuries are distinct from any effects of the acts of the Mexican government described above.   Had Defendants not committed their RICO violations and other criminal or otherwise improper conduct, Plaintiffs would not have suffered the damages specified immediately above.

133.    By virtue of these violations of 18 U.S.C. § 1962(c), and pursuant to 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiffs for actual damages, treble damages, the cost of this suit, and reasonable attorneys' fees.   Additionally, pursuant to 18 U.S.C. § 1964(a), Plaintiffs are entitled to an order that Defendants cease and reverse their fraudulent and extortionate activity by (i) calling and conducting new shareholder meetings at which they declare that the actions taken during the November 2014 Meetings are null and void *ab initio*; (ii) declaring that Plaintiffs never transferred their shares in the Affected Juego

Companies to Grand Odyssey; and (iii) resigning from the boards for all of the Juego Companies.

## COUNT III
### Violation of 18 U.S.C. § 1962(d)
### RICO, Conspiracy
### (Against All Defendants)

134.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs from paragraphs 51 through 112 and Count II as if set forth herein.

135.    Defendants and their agents, employees, and co-conspirators agreed and conspired to participate in, or to facilitate the commission of, predicate acts as stated above, and agreed and conspired to facilitate the acts leading to the substantive offense of conducting the affairs of the enterprise through a pattern of racketeering activity, which included the repeated acts alleged above, in violation of 18 U.S.C. § 1962(d).

136.    The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the section 1962(c) enterprise described previously through a pattern of racketeering activity.

137.    As demonstrated in detail above, Defendants and co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations, omissions, and extortion designed to deprive Plaintiffs of their rights.

138.    The nature of the above-described acts of Defendants and their co-conspirators' material misrepresentations, omissions, and extortion in furtherance of the conspiracy give rise to an inference that the members of the enterprise not only agreed to the objective of a RICO conspiracy under 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), but also that

they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

139.    As a direct and proximate result of Defendants' and their co-conspirators' conspiracy to participate in the conduct of the affairs of the enterprise alleged herein, Plaintiffs have been and are continuing to be injured in their property and person, as set forth above.

140.    By virtue of these violations of 18 U.S.C. § 1962(d), and pursuant to 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiffs for actual damages, treble damages, the cost of this suit, and reasonable attorneys' fees.  Further, pursuant to 18 U.S.C. § 1964(a), Plaintiffs are entitled to an order that Defendants cease and reverse their fraudulent and extortionate activity by (i) calling and conducting new shareholder meetings at which they declare that the actions taken during the November 2014 Meetings are null and void *ab initio*; (ii) declaring that Plaintiffs never transferred their shares in the Affected Juego Companies to Grand Odyssey; and (iii) resigning from the boards for all of the Juego Companies.

**COUNT IV**
**Violation of Colo. Rev. Stat. §§ 18–17–104(3)**
**COCCA, Racketeering Activity**
**(Against All Defendants)**

141.    Plaintiffs reallege and incorporate by reference the allegations from paragraphs 51 through 112 and Count II set forth above as if set forth fully here.

142.    At all relevant times, Plaintiffs were persons within the meaning of Colo. Rev. Stat. §§ 18–17–103(4) and 18–17–106(6) and (7).

143.    At all relevant times, Defendants were persons within the meaning of Colo. Rev. Stat. §§ 18–17–103(4) and 18–17–104(3).

144.    At all relevant times, Defendants formed an association-in-fact for the purpose of assuming control of the board of each of the Juego Companies, attempting the illegal transfer of

Plaintiffs' shares of each of the Affected Juego Companies, and attempting to extort millions of dollars to undo the clouded title created by their illegal actions.   This association was an "enterprise" within the meaning of Colo. Rev. Stat. § 18–17–103(2).

145.    At all relevant times, Defendants conducted or participated knowingly, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of Colo. Rev. Stat. § 18–17–103(3).

146.    Specifically, at all relevant times, Defendants engaged in "racketeering activity" within the meaning of Colo. Rev. Stat. § 18–17–103(5) by engaging in the acts set forth above. Further, as set forth above, these acts constitute violations of one or more of the following statutes:  18 U.S.C. § 1951 (extortion, and conspiracy therewith), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1028(a)(3), (7) (identity theft),  Colo. Rev. Stat. § 18–3–207 (criminal extortion), and Colo. Rev. Stat. § 18–4–401 (criminal theft).   Defendants each committed and/or aided and abetted the commission of two or more of these acts of racketeering activity, as set forth above, thereby constituting a pattern of racketeering activity.

147.    As a result of Defendants' violations of Colo. Rev. Stat. § 18–17–104(3), Plaintiffs have been damaged as set forth in Count II.

148.    By virtue of these violations of Colo. Rev. Stat. § 18–17–104(3), Defendants are jointly and severally liable to Plaintiffs for actual damages, treble damages, the cost of this suit, and reasonable attorneys' fees.  Further, pursuant to Colo. Rev. Stat. § 18–17–106(6), Plaintiffs are entitled to an order that Defendants cease and reverse their fraudulent and extortionate activity by (i) calling and conducting new shareholder meetings at which they declare that the actions taken during the November 2014 Meetings are null and void *ab initio*; (ii) declaring that

Plaintiffs never transferred their shares in the Affected Juego Companies to Grand Odyssey; and (iii) resigning from the boards for all of the Juego Companies.

## COUNT V
### Violation of Colo. Rev. Stat. §§ 18–17–104(4)
### COCCA, Conspiracy
### (Against All Defendants)

149.    Plaintiffs reallege and incorporate by reference the allegations set forth from paragraphs 51 through 112 and Count IV above as if set forth fully here.

150.    Defendants and their agents and co-conspirators agreed, conspired, and endeavored to violate the provisions of Colo. Rev. Stat. § 18–17–104(3), as set forth in Count IV, by agreeing, conspiring, and endeavoring, through an association-in-fact, to assume control of the board of each of the Juego Companies, attempting the illegal transfer of Plaintiffs' shares of each of the Affected Juego Companies, and attempting to extort millions of dollars to undo the clouded title created by their illegal actions, in violation of Colo. Rev. Stat. § 18–17–104(4).

151.    Likewise, Defendants and their agents and co-conspirators agreed, conspired, and endeavored to participate in or to facilitate commission of predicate acts as stated in Count IV, and agreed to facilitate the acts leading to the substantive offense of conducting the affairs of the enterprise through a pattern of racketeering activity, which included the repeated acts alleged above, in violation of Colo. Rev. Stat. § 18–17–104(4).

152.    As demonstrated in detail above, Defendants and their agents, employees, and co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations, omissions, and extortion designed to deprive Plaintiffs of their rights.

153.    The nature of the above-described acts of Defendants and their agents', employees', and co-conspirators' material misrepresentations, omissions, and extortion in

furtherance of the conspiracy give rise to an inference that the members of the enterprise not only agreed to the objective of a violation of Colo. Rev. Stat. § 18–17–104(4) by conspiring to violate Colo. Rev. Stat. § 18–17–104(3), but also that they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

154.    As a direct and proximate result of Defendants' and their agents', employees', and co-conspirators' conspiracy to participate in the conduct of the affairs of the enterprise alleged herein, Plaintiffs have been and are continuing to be injured in their property and person, as set forth in Count II.

155.    By virtue of these violations of Colo. Rev. Stat. § 18–17–104(4), Defendants are jointly and severally liable to Plaintiffs for actual damages, treble damages, the cost of this suit, and reasonable attorneys' fees.  Further, pursuant to Colo. Rev. Stat. § 18–17–106(6), Plaintiffs are entitled to an order that Defendants cease and reverse their fraudulent and extortionate activity by (i) calling and conducting new shareholder meetings at which they declare that the actions taken during the November 2014 Meetings are null and void *ab initio*; (ii) declaring that Plaintiffs never transferred their shares in the Affected Juego Companies to Grand Odyssey; and (iii) resigning from the boards for all of the Juego Companies.

### COUNT VI
### Fraud under Colorado Common Law
### (Against All Defendants)

156.    Plaintiffs reallege and incorporate by reference the allegations set forth from paragraphs 51 through 112 and Count II above as if set forth fully here.

157.    As set forth above, Chow represented falsely, with the knowing encouragement and assistance of the other Defendants, that his relationships at SEGOB would allow the Casinos to reopen.  Defendants further represented falsely in anticipation of the August 29, 2014

Meetings that (i) SEGOB would allow the Casinos to reopen if Defendants took over the board of each Juego Company; (ii) Chow and the other Defendants needed to take control of the boards of the Juego Companies and remove Plaintiffs' representatives from the board in order to move forward with the contemplated transaction; and (iii) Chow, the other Defendants, and their representatives would resign from the boards of the Juego Companies if the contemplated transactions did not materialize and the Casinos did not reopen.

158.    Defendants knew that these representations were false, and that they instead intended to exercise their power as managers to attempt to appropriate Plaintiffs' Series B shares in the Affected Juego Companies, to prevent shareholder meetings to remove Defendants from the board of each Juego Company, to take control of the Casinos and the assets thereof, and to otherwise harm Plaintiffs.

159.    These representations were material, causing Plaintiffs to allow Defendants onto the board of each Juego Company.

160.    Defendants took positions on the boards intending to harm Plaintiffs for Defendants' sole benefit.   Defendants then abused their board positions by transferring or purporting to transfer Plaintiffs' shares in the Affected Juego Companies to Grand Odyssey, preventing shareholder meetings to remove Defendants from the Juego Company boards, and refusing to resign from those boards.

161.    Plaintiffs justifiably relied on Defendants' representations when sending their August 2014 Meeting proxy letters to Chow, who abused the authority granted by those letters for his own benefit and the benefit of the other Defendants.

162.    Plaintiffs' justifiable reliance on Defendants' false representation has caused damage to Plaintiffs.

163.     Additionally, notwithstanding demands, and notwithstanding Defendants' false statements that they would comply, Defendants refuse to resign as managers, thereby perpetuating and continuing to benefit from their fraud.

164.     For their fraud, Defendants are jointly and severally liable to Plaintiffs for actual damages in an amount to be proven at trial, punitive damages pursuant to Colo. Rev. Stat. § 13–21–102, the cost of this suit, and reasonable attorneys' fees.  Further, Plaintiffs are entitled to an order that Defendants cease and reverse their fraudulent and extortionate activity by (i) calling and conducting new shareholder meetings at which they declare that the actions taken during the November 2014 Meetings are null and void *ab initio*; (ii) declaring that Plaintiffs never transferred their shares in the Affected Juego Companies to Grand Odyssey; and (iii) resigning from the boards for all of the Juego Companies.

## COUNT VII
### Civil Theft under Colo. Rev. Stat. § 4–18–405
### (Against All Defendants)

165.     Plaintiffs reallege and incorporate by reference the allegations set forth from paragraphs 51 through 112 and Count II above as if set forth fully here.

166.     If the Court finds that Plaintiffs' Series B shares in the Affected Juego Companies have been transferred to Grand Odyssey, Plaintiffs assert that Defendants knowingly obtained and exercised control over Plaintiffs' Series B shares in the Affected Juego Companies without authorization and by threat and deception.

167.     In violation of Colo. Rev. Stat. § 4–18–401, Defendants obtained, retained, and exercised control over Plaintiffs' Series B shares in the Affected Juego Companies with intent to deprive Plaintiffs permanently of the use and benefit of those shares, and have demanded consideration to which they are not legally entitled as a condition of restoring Plaintiffs' shares.

168.    Plaintiffs have suffered damages as a result of Defendants' civil theft in an amount to be proven at trial.

169.    For their theft, Defendants are jointly and severally liable to Plaintiffs under Colo. Rev. Stat. § 4–18–405 for the higher of actual or statutory damages, plus treble damages, the cost of this suit, and reasonable attorneys' fees.

## COUNT VIII
### Conversion under Colorado Common Law
### (Against All Defendants)

170.    Plaintiffs reallege and incorporate by reference the allegations set forth from paragraphs 51 through 112 and Count II above as if set forth fully here.

171.    If the Court finds that Plaintiffs' Series B shares in the Affected Juego Companies have been transferred, Plaintiffs assert that Defendants, without authorization, exercised dominion and control over Plaintiffs' Series B shares in the Affected Juego Companies, and deprived Plaintiffs of the use, enjoyment, and value of those shares.

172.    At the time of Defendants' conversion through the present, Plaintiffs were and are the rightful owners of their Series B shares in the Affected Juego Companies.

173.    Defendants converted Plaintiffs' shares with fraud, malice, and a reckless and wanton disregard for Plaintiffs' rights.

174.    Defendants' conversion has caused Plaintiffs damages in an amount to be proven at trial.

175.    Despite demands, and notwithstanding Defendants' false statements that they would comply, Defendants refuse to take actions to void *ab initio* any transfer of Plaintiffs' shares in their favor and to restore undisputed control of the shares to Plaintiffs.

176.   For their conversion, Defendants are jointly and severally liable to Plaintiffs for actual damages, punitive damages pursuant to Colo. Rev. Stat. § 13–21–102, the cost of this suit, and reasonable attorneys' fees.  Further, Plaintiffs are entitled to an order that Defendants cease and reverse their fraudulent and extortionate activity by (i) calling and conducting new shareholder meetings at which they declare that the actions taken during the November 2014 Meetings are null and void *ab initio*; (ii) declaring that Plaintiffs never transferred their shares in the Affected Juego Companies to Grand Odyssey; and (iii) resigning from the boards for all of the Juego Companies.

## COUNT IX
## Civil Conspiracy
## (Against All Defendants)

177.   Plaintiffs reallege and incorporate by reference the allegations set forth from paragraphs 51 through 112 and Counts II, VI, VII, and VIII above as if set forth fully here.

178.   Plaintiffs assert, as alleged above in Count VI, that Defendants entered a conspiracy to defraud Plaintiffs by inducing Plaintiffs into granting Defendants control of the Juego Company boards, and by attempting to appropriate Plaintiffs' Series B shares in the Affected Juego Companies, preventing shareholder meetings to remove Defendants from the board of each Juego Company, and taking control of the Casinos and the assets thereof. Additionally, if the Court finds that Plaintiffs' Series B shares in the Affected Juego Companies have been transferred to Grand Odyssey, Plaintiffs also assert, as alleged above in Count VII, that Defendants entered a conspiracy to obtain, retain, and exercise control over Plaintiffs' Series B shares with intent to deprive Plaintiffs permanently of the use and benefit of those shares, and to demand consideration to which they are not legally entitled as a condition of restoring Plaintiffs' shares, in violation of Colo. Rev. Stat. § 4–18–401.  Additionally, if the Court finds

that Plaintiffs' Series B shares in the Affected Juego Companies have been transferred to Grand Odyssey, Plaintiffs assert, as alleged above in Count VIII, that Defendants entered a conspiracy to convert Plaintiffs' shares in the Juego Companies.

179.    Defendants met in person, by phone, and electronically in furtherance of their conspiracy and had a meeting of the minds to defraud Plaintiffs, and/or to steal Plaintiffs' shares, and/or to convert Plaintiffs' shares.

180.    Defendants took overt acts toward fulfillment of the conspiracy by, among other things, stating falsely to Plaintiffs that Chow had relationships with SEGOB that would allow the Casinos to reopen; stating falsely to Plaintiffs that SEGOB would allow the Casinos to reopen if Defendants replaced Plaintiffs' representatives on the Juego Company boards; and taking positions on the Juego Company boards while intending to exercise those positions for their own benefit and to appropriate Plaintiffs' shares, abusing their board positions to transfer or purport to transfer Plaintiffs' shares to Grand Odyssey.   Defendants took other overt acts, including stating falsely at the November 2014 Meetings that Chow had authority from Plaintiffs to transfer their shares in order to convince others to vote to approve transfer of those shares; transferring or purporting to transfer Plaintiffs' shares in the Affected Juego Companies to Grand Odyssey; refusing to take actions to void *ab initio* any transfer of Plaintiffs' shares in their favor and to return the shares after multiple requests; refusing to resign from the boards; and preventing Plaintiffs from holding shareholder meetings to remove Defendants from the boards and/or to reverse Defendants' actions.

181.    At the time of Defendants' conspiracy through the present, Plaintiffs were and are the rightful owners of those shares.

182.    Defendants conspired to convert Plaintiffs' shares, and took all other alleged actions, with fraud, malice, and a reckless and wanton disregard for Plaintiffs' rights.

183.    As a result of Defendants' conspiracy, Plaintiffs have suffered damages in an amount to be proven at trial.

184.    Additionally, notwithstanding demands, and notwithstanding Defendants' false statements that they would comply, Defendants refuse to resign as managers and refuse to take action to restore the shares and/or unclouded title to the shares to Plaintiffs, thereby perpetuating and continuing to benefit from their fraudulent conspiracy.

185.    For their conspiracy, Defendants are jointly and severally liable to Plaintiffs for actual damages, punitive damages pursuant to Colo. Rev. Stat. § 13–21–102, the cost of this suit, and reasonable attorneys' fees.  Further, for their conspiracy to commit theft, Defendants are jointly and severally liable to Plaintiffs under Colo. Rev. Stat. § 4–18–405 for the higher of actual or statutory damages, plus treble damages, the cost of this suit, and reasonable attorneys' fees.  Further, Plaintiffs are entitled to an order that Defendants cease and reverse their fraudulent and extortionate activity by (i) calling and conducting new shareholder meetings at which they declare that the actions taken during the November 2014 Meetings are null and void *ab initio*; (ii) declaring that Plaintiffs never transferred their shares in the Affected Juego Companies to Grand Odyssey; and (iii) resigning from the boards for all of the Juego Companies.

## VI.    JURY DEMAND

Plaintiffs demand a jury for all matters so triable.

## VII.   REQUEST FOR RELIEF

Plaintiffs request the following relief:

A.     Declaration that Plaintiffs' Series B shares in the Affected Juego Companies were not transferred away from Plaintiffs at or through the November 2014 Meetings, and/or that any transfer that may have been effectuated of Plaintiffs' shares by Defendants was illegal, and requiring Defendants to take all necessary actions to void *ab initio* any illegal transfer;

B.     Actual, compensatory, consequential, treble, and punitive damages, with prejudgment and postjudgment interest thereon at the highest rate allowed by law;

C.     A preliminary injunction preventing Defendants from taking any actions on behalf of the Juego Companies during the pendency of this action unless ordered by this Court to do so;

D.     A permanent injunction requiring Defendants, within fourteen days of final judgment, to (i) take all actions necessary to void *ab initio* and, if needed, to restore to Plaintiffs unclouded title to their Series B shares in the Affected Juego Companies, including without limitation calling and conducting proper shareholder meetings to declare void *ab initio* and of no effect any actions to transfer Plaintiffs' shares taken at the November 2014 Meetings; (ii) deliver the books and all other property and assets of all of the Juego Companies to the Plaintiffs, (iii) undo and reverse any unauthorized actions taken by Defendants on behalf of the Juego Companies; and (iv) immediately thereafter resign from their positions on the board of each Juego Company;

E.     Attorneys' fees and costs of court as allowed by law; and,

F.     All other relief, legal or equitable, to which Plaintiffs show themselves entitled.

Date:  June 6, 2016

Respectfully submitted,

Quinn Emanuel Urquhart & Sullivan LLP
*Counsel to Plaintiffs*


/s/ David Orta
David M. Orta
District of Colombia Bar No. 462083
Admitted to D. Colo. Bar
davidorta@quinnemanuel.com
777 6th Street NW, 11th floor
Washington, D.C.  20001
Tel. 202 538 8000
Fax 202 538 8100


/s/ Charles R. Eskridge III
Charles R. Eskridge III
Texas State Bar No. 06666350
Admitted to D. Colo. Bar
charleseskridge@quinnemanuel.com
711 Louisiana Street, Suite 500
Houston, Texas  77002
Tel. 713 221 7000
Fax 713 221 7100


/s/ Jared Wilkerson
Jared Wilkerson
Texas State Bar No. 24084096
Admitted to D. Colo. Bar
jaredwilkerson@quinnemanuel.com
711 Louisiana Street, Suite 500
Houston, Texas  77002
Tel. 713 221 7000
Fax 713 221 7100